UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ESSEX INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:08CV01595 ERW |
| | ) |
| PARIC CORPORATION, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendants' Motion for Partial Summary Judgment as to Coverage [doc. #78], Plaintiff's Motion for Summary Judgment on Plaintiff's Declaratory Judgment [doc. #79], and Plaintiff's Motion for Summary Judgment on Defendants' Counterclaims [doc. #82].

**I.    PROCEDURAL BACKGROUND**

On October 15, 2008, Plaintiff Essex Insurance Company ("Plaintiff") filed a complaint against Defendants Paric Corporation, Clarinet, LLC, Pete Rothschild, R. Michael Allen, Samuel B. Berger, Richard W. Darragh[1], and St. Johns Bank & Trust Company (collectively, "Defendants").  The Complaint seeks a declaratory judgment from this Court, declaring that an insurance policy issued by Plaintiff to Defendant Clarinet, LLC does not provide coverage for claims asserted in a breach of contract lawsuit filed by Defendant Paric Corporation against the other Defendants in state court.  Defendant Clarinet, LLC and its member insureds, Defendants

---

[1]Richard W. Darragh died on March 10, 2009.  On July 9, 2009, this Court granted Plaintiff's Motion for Substitution of Party [doc. #53], and ordered that the Estate of Richard W. Darragh be substituted as a party Defendant in this matter.

Pete Rothschild, R. Michael Allen, Samuel B. Berger, and the Estate of Richard W. Darragh (collectively,"the Clarinet Defendants") then filed various counterclaims against Plaintiff, seeking a declaratory judgment of coverage and alleging breach of contract and vexatious and bad faith refusal to pay. The Clarinet Defendants filed their Motion for Partial Summary Judgment as to Coverage [doc. #78] on April 30, 2010, requesting that the Court enter partial summary judgment in their favor on the issue of coverage.[2] Also on April 30, 2010, Plaintiff filed two Motions for Summary Judgment [docs. #79, 82], the first seeking judgment in its favor on its declaratory judgment claim, and the second requesting that the Court deny the counterclaims asserted by the Clarinet Defendants.

## II. STATEMENT OF FACTS[3]

---

[2]Defendant St. John's Bank & Trust Company filed a Memorandum [doc, #93] noting its support of Defendants' Motion for Partial Summary Judgment, and adopting the arguments they made in opposition to Plaintiff's Motions for Summary Judgment. Defendant Paric Corporation did not make any summary judgment related filings.

[3]The Court's recitation of the facts is based on: Defendants' Statement of Uncontroverted Material Facts [doc. #83-2]; Plaintiff's Response to Defendants' Statement of Uncontroverted Material Facts [doc. #94]; Plaintiff's Statement of Additional Uncontroverted Material Facts [doc. #96]; Clarinet Defendants' Response to Plaintiff's Statement of Additional Uncontroverted Material Facts in Opposition to Clarinet Defendants' Motion for Summary Judgment [doc. #101]; Statement of Uncontroverted Material Facts in Support of Motion for Summary Judgment on Plaintiff's Declaratory Judgment [doc. #81]; Clarinet Defendants' Response to Plaintiff's Statement of Uncontroverted Material Facts in Support of Motion for Summary Judgment on Plaintiff's Declaratory Judgment and Statement of Additional Material Facts [doc. #92]; Plaintiff's Response to Defendants' Statement of Additional Material Facts in Response to Plaintiff's Motion for Summary Judgment on Declaratory Judgment [doc. #104]; Statement of Uncontroverted Material Facts in Support of Motion for Summary Judgment on Defendants' Counterclaims [doc. #85]; Clarinet Defendants' Response to Plaintiff's Statement of Uncontroverted Material Facts in Support of Motion for Summary Judgment on Defendants' Counterclaims and Statement of Additional Material Facts [doc. #91]; and Plaintiff's Response to Defendants' Statement of Additional Material Facts in Response to Plaintiff's Motion for Summary Judgment on Defendants' Counterclaims. The Court also considered the exhibits submitted by the Parties, where appropriate.

Defendant Clarinet, LLC is the owner of real property located at 612 N. 1st Street, St. Louis, Missouri 63102, which was the former location of the Switzer Building. Richard Darragh was the manager of Defendant Clarinet, LLC, and oversaw the acquisition, development, and ultimately, the demolition of the Switzer Building. He was also the President of Pegasus Development, and within that position, he managed Defendant Clarinet's ownership and development of the Switzer Building.

The Switzer Building was a turn of the century masonry structure that consisted of six stories above grade, one story below grade, and an annex building. The building was a historical building that was listed on the National Register of Historic Places as part of Laclede's Landing Historic District. On August 27, 2004, the City of St. Louis issued a Notice of Condemnation regarding the Switzer Building. Defendant Clarinet purchased the property in 2005, with the intent to renovate the vacant building into luxury condominiums with street level retail and commercial space. Prior to Defendant Clarinet's purchase of the property, Mr. Darragh had knowledge of various code violations for the Switzer Building. In a permit application dated January 13, 2006, Defendant Clarinet sought permission to complete interior demolition and shoring of the Switzer Building.

On July 19, 2006, a severe windstorm struck the City of St. Louis metropolitan area ("the Storm"), causing a portion of the Switzer Building to collapse. The Storm blew bricks and debris from the Switzer Building onto the Eads Bridge, causing property damage to the bridge and an electrical substation, St. Louis City property. The Storm destroyed major portions of the south and east walls of the building and substantial portions of the roof and floor area, and destroyed or shifted interior structural members of the building. The Storm left large portions of the east and

north walls with no support. The Storm damage further exposed the building's interior to the weather, resulting in continued deterioration. The partially destroyed south wall of the Switzer Building was located immediately adjacent to the Eads Bridge, electrical substation and other St. Louis City property that had been damaged by the Switzer Building's partial collapse in the Storm.

Notwithstanding emergency shoring efforts undertaken after the Storm, this dangerous condition and threat to persons and property, including the adjacent City Property, persisted. On January 23, 2007, Defendant Clarinet entered into a contract with Defendant Paric to demolish the Switzer Building. Because the building was listed as a historic landmark, Defendant Clarinet had to seek the approval of various St. Louis City agencies in order to demolish the building. On March 6, 2007, Defendant Clarinet applied for a permit from the City of St. Louis to machine wreck the Switzer Building. Despite the unstable condition of the building, the City initially resisted Defendant Clarinet's request to demolish the building, and sought the preservation of some or all of the structure. On May 10, 2007, the City of St. Louis gave approval for the Eads Bridge to be closed from May 14, 2007 through May 23, 2007, to demolish the Switzer Building. Defendant Clarinet engaged Defendant Paric Corporation to demolish the building, which Defendant Paric completed on or around June 18, 2007. The demolition costs exceeded $650,000.00.

On June 6, 2007, St. Louis City building inspectors issued a Notice of Emergency Condemnation that required immediate demolition of the building to abate the danger and hazard that the building presented to persons and third party property, including the Eads Bridge and St. Louis City property immediately adjacent to the Switzer Building. The Notice stated that the City

inspected the Switzer Building and concluded that "it cannot be made reasonably safe without demolition and removal of the above described structure(s) and clearance of the above described premises." The Notice further stated that "[y]ou are hereby ordered to have the above mentioned structure(s) removed immediately and the premises cleared of said conditions."

On or about July 7, 2006, Plaintiff issued a Commercial General Liability insurance policy to Defendant Clarinet, Policy Number 3CM5800, effective July 7, 2006 through October 7, 2006. Plaintiff thereafter provided Defendant Clarinet with insurance under renewal policies through July 24, 2007. The last Policy, Policy Number 3CV2139, was effective April 24, 2007 through July 24, 2007 (all policies collectively referred to as "the Policy"). Defendant Clarinet paid all premiums due under the Policy, and the Policy was in force at all relevant times.

The Policy provides coverage to Defendant Clarinet, its members, managers, and any person or organization acting as Defendant Clarinet's real estate manager, for any claim for "bodily injury" or "property damage" caused by an "occurrence" that takes place in the "coverage territory." Specifically, the Policy provides:

SECTION I - COVERAGES

COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate and "occurrence" and settle any claim or "suit" that may result. But:

5

    (1)    The amount we will pay for damages is limited as described in Section III - Limits of Insurance; and

    (2)    Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A and B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B

  b.    This insurance applies to "bodily injury" and "property damage" only if:

    (1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

    (2)    The "bodily injury" or "property damage" occurs during the policy period . . . .

The Policy provides coverage for "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The Policy defines "property damage" as

  (a)    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

  (b)    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

The Policy defines "occurrence" as "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions." The Policy contains an "owned property" exclusion, which provides:

  2.    Exclusions

    This insurance does not apply to:

6

* * *

    j.    Damage to Property

        "Property damage" to

        (1)    Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property.

The Policy contains a Combination General Endorsement, Form ME-001 (01/07), which provides:

> THIS ENDORSEMENT AMENDS THE LIABILITY COVERAGE FORM OR COVERAGE PART (hereinafter referred to as Coverage Form), AND APPLIES TO THE ENTIRE POLICY.
>
> * * *
>
> 5.    This insurance does not apply to claims arising out of breach of contract, whether written or oral, express or implied, implied-in-law, or implied - in fact contract.

The Policy also includes a Vacant Building Endorsement:

> THIS ENDORSEMENT CHANGES THE POLICY.
>
> This policy does not provide insurance coverage or defense for claims, loss, costs, and/or expenses for claims arising from renovation, demolition, or construction operations or any owner or tenant occupancy at any building, or part of a building, classified on this policy as vacant.

The declaration page of the Policy specifically identifies the business description of the building as "vacant building." The supplemental declarations page of the Policy also states that the building was "vacant" under the heading "Description of Hazards/Insured Classification(s)." Additionally,

the insurance application for the Policy states that the building was "vacant" under the heading "Schedule of Hazards: Classification."

On April 19, 2007, Mr. Darragh, as the manager and agent of Defendant Clarinet, and on behalf of its member insureds, signed a commercial application for insurance coverage of the Switzer Building from Plaintiff, in which he represented that Defendant Clarinet was not contemplating any structural alterations or demolition exposure. Then, on April 24, 2007, he sent a letter notifying Defendant Clarinet's insurance agent, Terina AuBuchon of Affiliated Insuance Agencies, that there were no known losses at the Switzer Building. On May 11, 2007, Plaintiff became aware that bricks had previously fallen from the vacant Switzer Building, causing damage to a bridge owned by the City of St. Louis. Plaintiff did not become aware of the demolition of the Switzer Building until sometime after the building was actually demolished.

On or about June 5, 2008, Defendant Paric filed a lawsuit in the Circuit Court for the City of St. Louis, State of Missouri, Cause Number 0822-CC02140, against Defendant St. Johns Bank & Trust Company and the Clarinet Defendants to collect the alleged balance due for the demolition ("the Paric Lawsuit"). Count I of the Petition in the Paric Lawsuit alleges breach of contract against Defendant Clarinet, while Count II alleges breach of guaranty contract against Defendant Clarinet's member insureds. The Petition further alleges in Count III that Defendant Clarinet failed to pay for the demolition work performed by Paric, and therefore, under the doctrine of *quantum meruit*, Paric is allegedly entitled to the reasonable value of its work performed. In Court IV, Paric requests the imposition of a mechanic's lien on the property at issue, and in Count V, Paric requests that the court equitably determine the priority interests in the

property of Defendant St. Johns Bank & Trust Company by virtue of Deed of Trust, and of Paric by virtue of its mechanic's lien.

The City of St. Louis also filed a lawsuit against the Clarinet Defendants for damage caused to the Eads Bridge when bricks and debris from the Storm struck the bridge ("the City Lawsuit"). Plaintiff acknowledged coverage and is providing the Clarinet Defendants with an unqualified defense and indemnity in the City Lawsuit. On several occasions, the Clarinet Defendants tendered the Paric Lawsuit to Plaintiff for defense and indemnity. Although Plaintiff has agreed to provide an unqualified defense and indemnity in the City Lawsuit, Plaintiff has denied any and all coverage for Defendant Clarinet's stabilization and demolition of the Switzer Building.

## III. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Supreme Court has noted that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327 (quoting Fed. R. Civ. P. 1). "By its very terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are

9

those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Further, if the nonmoving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish the absence of any genuine issue of material fact. *Id.* at 323; *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991). Once this burden is discharged, if the record does in fact bear out that no genuine dispute exists, the burden then shifts to the nonmoving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. *Anderson*, 477 U.S. at 250; Fed. R. Civ. P. 56(e)(2). When the burden shifts, the nonmoving party may not rest on the allegations in its pleadings, but, by affidavit and other evidence, must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 465 (8th Cir. 2002). To meet its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In fact, the nonmoving party must show there is sufficient evidence favoring the nonmoving party which would enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 334. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson*, 943 F.2d at 883.

The Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000). The Court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." *Id.*

## IV. DISCUSSION

This case involves the interpretation of an insurance policy that was issued by Plaintiff to Defendant Clarinet. Under Missouri law, "[i]nsurance policies are contracts," and "[t]he rules of contract construction govern insurance policies." *Blair by Snider v. Perry County Mut. Ins. Co.*, 118 S.W.3d 605, 606 (Mo. 2003) (en banc). The insured "has the burden of showing that the loss and damages are covered by the policy," while the insurer "has the burden of demonstrating the applicability of any exclusions on which it relies." *Am. States Ins. Co. v. Mathis*, 974 S.W.2d 647, 649 (Mo. Ct. App. 1998). "Where insurance policies are unambiguous, they will be enforced as written absent a statute or public policy requiring coverage. . . . If the language is ambiguous, it will be construed against the insurer." *Peters v. Employers Mut. Cas. Co.*, 853 S.W.2d 300, 302 (Mo. 1993) (en banc).

Both Plaintiff and Defendants seek a declaratory judgment with respect to the issue of whether the insurance policy issued by Plaintiff to Defendant Clarinet provides coverage for the claims asserted against the Clarinet Defendants in the Paric lawsuit. Additionally, the breach of contract and vexatious and bad faith refusal to pay counterclaims asserted by the Clarinet Defendants depend on this Court's finding that Plaintiff had a duty to defend or indemnify the Clarinet Defendants with respect to the breach of contract claims asserted by Defendant Paric in

11

the state court lawsuit. Accordingly, the Court must first examine the duty to defend or indemnify contained in the Policy at issue in this case.

In determining whether an insurer has a duty to defend,[4] a court must consider whether "there is a potential or possible liability to pay based on the facts at the outset of the case." *Stark Liquidation Co. v. Florists' Mut. Ins. Co.*, 243 S.W.3d 385, 392 (Mo. Ct. App. 2007). The duty is not dependent "on the probable liability to pay based on the facts ascertained through trial," rather, "[a]n insurer's duty to defend a suit against its insured is determined by comparing the language of the insurance policy with the allegations asserted in the plaintiff's petition." *Id.* "If the complaint merely alleges facts that give rise to a claim potentially within the policy's coverage, the insurer has a duty to defend." *McCormack Baron Mgmt. Servs., Inc. v. Am. Guar. & Liab. Ins. Co.*, 989 S.W.2d 168, 170-71 (Mo. 1999).

The insurance policy at issue in this case is a Commercial General Liability policy, which provides, "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages." In order for the insurer to be obligated to pay, the "bodily injury" or "property damage" must have been "caused by an occurrence." (Pl.'s Ex. 2, doc. #81-2, p.19 of 39). The policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Pl.'s Ex. 2, doc. #81-2, p.31 of 39).

---

[4]Because "[t]he duty to defend is broader than the duty to indemnify," when there is no duty to defend, there is also no duty to indemnify. *McCormack Baron Mgmt. Servs., Inc. v. Am. Guar. & Liab. Ins. Co.*, 989 S.W.2d 168, 170 (Mo. 1999). Thus, the Court will first consider whether Plaintiff has a duty to defend; if the Court determines that it does not, it will not be necessary to examine whether there is a duty to indemnify.

The allegations in the Paric Lawsuit are all based on Defendant Clarinet's alleged failure to comply with the terms of a contract it entered with Defendant Paric to demolish the Switzer Building. The plain language of the Policy at issue in this case establishes that the insurer does not have the duty or the right to defend the insured in a lawsuit, unless that lawsuit alleges an occurrence, or an accident. The breach of contract allegations that form the basis for the Paric Lawsuit are based on intentional acts, that cannot be interpreted to be accidental in any way. Moreover, Missouri courts have consistently held that a breach of contract is neither an occurrence nor an accident. *See, e.g.*, *J.E. Jones Constr. Co. v. Chubb & Sons, Inc.*, 486 F.3d 337, 341 (8th Cir. 2007) (applying Missouri law; "Courts have consistently held, however, that where the underlying cause of loss is a breach of contract, the breach of contract is not an 'occurrence' according to the applicable definition of 'occurrence.' . . . The rationale for these decisions is that because the performance of a contract is within the insured's control, a breach of that contract cannot qualify as an 'accident' and therefore cannot be an 'occurrence.'"); *Hartford Ins. Co. of the Midwest v. Wyllie*, 296 F. Supp. 2d 1033, 1038 (E.D. Mo. 2005) (applying Missouri law; "Wyllie's alleged breach of contract is not an accident"); *Koch Eng'g Co., Inc. v. Gibraltar Cas. Co., Inc.*, 878 F. Supp. 1286, 1288-89 (E.D. Mo. 1995) ("Missouri law rules that a breach of contract is not an occurrence."); *Hawkeye-Security Ins. Co. v. Davis*, 6 S.W.3d 419, 426 (Mo. Ct. App. 1999) (noting that "breach of a defined contractual duty cannot fall within the term 'accident'"); *Am. States Ins. Co. v. Mathis*, 974 S.W.2d 647, 650 (Mo. Ct. App. 1998) (finding that "breaches of contract are not 'accidents' or 'occurrences'"); *West v. Jacobs*, 790 S.W.2d 475, 478 (Mo. Ct. App. 1990) ("a breach of contract to abate rent or breach of the lease agreement in no way falls under the definition of occurrence"). The language of the policy at

issue is clear and unambiguous, so the Court is required to enforce the terms of the Policy, as written. Because a breach of contract cannot amount to an "accident" or an "occurrence," and because the Paric lawsuit involves only claims related to Defendant Clarinet's alleged failure to comply with the terms of its contract with Defendant Paric, the Court must conclude that Plaintiff had no potential or possible liability to pay at the outset of the Paric lawsuit, and thus, there was no duty to defend.

Defendants argue that the "occurrence" that triggered Plaintiff's duty to defend was the July 19, 2006 storm that damaged the Switzer Building. Defendants' argument is based on Plaintiff's assumption of Defendant Clarinet's defense in the City lawsuit. Specifically, Defendants assert that

> [t]he "occurrence" under the Policy on which coverage from the Clarinet Defendants' claims are based is the July 19, 2006 windstorm that partially collapsed the Switzer Building and blew bricks and debris onto the adjacent City property, causing damage to the City Property. Essex has acknowledged that this event constitutes an "occurrence" under the Policy in acknowledging coverage for Defendants in the City Lawsuit.

(Defs.' Reply Memo., doc. #100, p.1). The problem with Defendants' argument is that the claims made against the Clarinet Defendants in the Paric Lawsuit are not connected to the July 19, 2006 windstorm; rather, the claims are based on Defendant Paric's demolition of the Switzer Building in 2007, and the Clarinet Defendants' alleged subsequent refusal to pay. Moreover, as Defendants themselves stated, the "occurrence" in the City Lawsuit was "the July 19, 2006 windstorm that partially collapsed the Switzer Building and blew bricks and debris onto the adjacent City property, *causing damage to the City Property*." (Defs.' Reply Memo., doc. #100, p.1). Thus, the "occurrence" was not the windstorm itself, rather, it was damage to third party

14

property that was caused by the windstorm. The Paric Lawsuit involves entirely different facts, namely, the voluntary demolition of Defendant Clarinet's own property. Thus, Plaintiff's assumption of the defense in the City Lawsuit is irrelevant to whether Plaintiff has a duty to defend the Clarinet Defendants in the Paric Lawsuit.

Defendants repeatedly frame the issue in this case as whether the Policy at issue covers Defendant Clarinet's "efforts to prevent further collapse and resulting damage to third party property, including the Eads Bridge." (Defs.' Memo. in Support of Mtn., doc. #83, p.7). However, this is not a proper statement of the issue before the Court at this time. In their Amended Complaint and Counterclaims, respectively, both Plaintiff and Defendants have requested that the Court issue a declaratory judgment as to whether the Policy provides coverage for the breach of contract claims asserted against the Clarinet Defendants in the Paric Lawsuit. The Court has *not* been asked to determine whether Plaintiff is somehow obligated to pay the costs of the demolition of the Switzer Building. Defendants' arguments as to why Plaintiff should have to pay for the demolition costs are simply not relevant to this Court's determination of whether Plaintiff is obligated to provide a defense in the Paric Lawsuit.[5]

---

[5]For the most part, the cases cited by Defendants in support of their argument involve the issue of whether the insured must pay the actual costs associated with remediation to prevent further damage to third party property. The cited cases do not address the issue of whether the insurer must assume the defense in a breach of contract case against the insured for failing to pay for the remediation work. *See, e.g.*, *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1555 (9th Cir. 1991) ("Intel contacted Hartford in October 1981 and told its insurer about its discoveries at the Mountain View plant. Intel submitted a claim for reimbursement for the reasonable and necessary investigation and cleanup costs incurred by Intel in connection with the facility. . . . Hartford denied the claim in a letter dated May 19, 1982."); *Slay Warehousing Co., Inc. v. Reliance Ins. Co.*, 471 F.2d 1364, 1364 (8th Cir. 1973) ("The primary issue is whether the insurer is liable for expenses incurred by Slay Warehousing in taking reasonable mean to protect chemicals stored in its warehouse from damage due to exposure following the collapse of the warehouse wall.").

Both Parties devote substantial portions of their briefs to the applicability of the owned property exclusion and the vacant building endorsement. These provisions in the Policy at issue establish certain circumstances in which claims that would otherwise be covered are excluded from coverage. These exclusions would certainly be relevant to the issue of whether Plaintiff is contractually obligated to pay for demolition costs, but they have little, if any, relevance to the issue of whether Plaintiff must provide the Clarinet Defendants with a defense against breach of contract claims. Moreover, because this Court has determined that there was no "occurrence," and thus there is no coverage, it is not necessary to examine whether any of the coverage exclusions apply.

Defendants have not met their burden of demonstrating that the claims asserted against the Clarinet Defendants in the Paric Lawsuit are covered under the policy. Thus, the Court finds that it is appropriate to enter the declaratory judgment requested by Plaintiff, and deny the declaratory judgment requested by the Clarinet Defendants. Additionally, because the Court has determined that the claims are not covered, there is no basis for the Clarinet Defendants' remaining counterclaims against Plaintiff for breach of contract and vexatious and bad faith refusal to pay. Thus, the Court will deny Defendants' Motion for Partial Summary Judgment and grant both of Plaintiff's pending Motions for Summary Judgment.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Partial Summary Judgment as to Coverage [doc. #78] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment on Plaintiff's Declaratory Judgment [doc. #79] is **GRANTED**. Judgment is entered in favor of Plaintiff and, as requested by Plaintiff, the Court **DECLARES** that:

1. Policy No. 3CV2139 provides no coverage to CLARINET, or any of CLARINET'S members, including ROTHSCHILD, ALLEN, BERGER, and DARRAGH, or to any other person for the claims asserted against CLARINET in the PARIC lawsuit, Case No. 0822-CC02140;

2. ESSEX INSURANCE shall have no duty or obligation to defend CLARINET, or any of CLARINET'S members, including ROTHSCHILD, ALLEN, BERGER, and DARRAGH, in the PARIC lawsuit, Case No. 0822-CC02140; and

3. ESSEX INSURANCE shall have no duty or obligation to indemnify CLARINET, or any of its members, including ROTHSCHILD, ALLEN, BERGER, and DARRAGH any sum which CLARINET, or any of its members, including ROTHSCHILD, ALLEN, BERGER, and DARRAGH may become obligated to pay by way of settlement or judgment in connection with the PARIC lawsuit, Case No. 0822-CC02140.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment on Defendants' Counterclaims [doc. #82] is **GRANTED**. Defendants' Counterclaims against Plaintiff are **DISMISSED**, **WITH PREJUDICE**.

Dated this 6th Day of July, 2010.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE